PUBLIC SERVICE COMMISSION OF KENTUCKY, Movant,

v.

CONTINENTAL TELEPHONE COMPANY OF KENTUCKY, Respondent.

and

COMMONWEALTH of Kentucky, ex rel., Steven L. BESHEAR, Attorney General, Movant,

v.

CONTINENTAL TELEPHONE COMPANY, Respondent.

and

COMMONWEALTH of Kentucky, ex rel., David L. ARMSTRONG, Attorney General, Movant,

v.

CONTINENTAL TELEPHONE COMPANY OF KENTUCKY, Respondent.

and

CONTINENTAL TELEPHONE COMPANY OF KENTUCKY, Movant,

v.

PUBLIC SERVICE COMMISSION OF KENTUCKY and Commonwealth of Kentucky, ex rel., Steven L. Beshear, Attorney General, Respondents.

and

PUBLIC SERVICE COMMISSION OF KENTUCKY, Appellant,

v.

CONTINENTAL TELEPHONE COMPANY OF KENTUCKY, Appellee.

and

David ARMSTRONG, Attorney General, Appellant,

v.

CONTINENTAL TELEPHONE COMPANY OF KENTUCKY, Appellee.

Supreme Court of Kentucky.

July 3, 1985.

William Sawyer, Frankfort, for Public Service Commission.

E. Gaines Davis, Jr., Frankfort, for Continental Telephone Co.

Michael Beiting and James Brannen, Asst. Attys. Gen., Frankfort, for Commonwealth of Kentucky.

Wayne L. Goodrum, Durham, N.C., Pamela Johnson, Frankfort, amicus curiae, General Telephone of Kentucky.

WINTERSHEIMER, Justice.

## AFFIRMING IN PART AND REVERSING IN PART

These appeals arise from two decisions by different panels of the Court of Appeals which reached opposite results.

In Case No. 84–SC–613, the Court of Appeals affirmed in part the decision of the Public Service Commission while in Case No. 84–SC–360 and 368, the court reversed the commission.

The three principal issues involve the appropriate rate-making treatment of 1) job development investment tax credit, 2) rate of return on common equity and 3) intrastate toll revenue.

The specific questions are whether the commission properly attributed a hypothetical interest expense to the debt component of the tax credit, whether the rate of return allowed by the commission was unreasonably low and whether the commission may use measurable data outside of the test year as against historical data.

■ The procedures and limitations of judicial review of orders of the Public Service Commission are set out in KRS 278.-410 through 278.450. In a public utility regulatory matter, the complaining party must show by clear and convincing proof that the determination of the agency was unlawful or unreasonable. KRS 278.430.

On December 29, 1981, Continental Telephone Company filed a notice of intent to raise its rates for telephone service by $3,077,719 annually in Case No. 84–SC–613–DG. After hearings, the PSC granted $912,746 of additional revenue annually. The circuit court reversed the decision of the commission but the Court of Appeals reversed the circuit court and reinstated the findings of the commission in regards to tax credit and rate of return. This appeal followed.

This Court affirms the decision of the Public Service Commission in regard to job development investment tax credit, rate of return and treatment of intrastate toll revenue.

On March 30, 1981, Continental sought additional revenues in Case No. 360 and 368 of $3,872,226 annually. After two public hearings and consideration of the evidence and briefs submitted by the parties, the commission granted a rate increase of $1,091,605. The commission increased the adjusted intrastate toll revenues by $584,-494 to reflect additional revenues which would be received by Continental under the revenue settlement process with South Central Bell. The commission restated toll revenues Continental would receive from Bell based in large part on Bell's expected rate of return which in fact forms a basis for the revenue settlement formula. Continental used a 7.76 percent return figure

based on Bell's actual earnings in 1980. The commission relied on the return authorized for Bell in its September, 1981 rate order of 11.34 percent. That order predated the rate award in the Continental case and granted South Central Bell nearly $40 million in additional annual revenues.

## I JOB DEVELOPMENT INVESTMENT TAX CREDIT

The commission's treatment of the job development investment tax credit is correct and consistent with Federal laws and regulations creating the credit. In 1971, under I.R.C. § 46(f) (West 1982), Congress enacted the tax credit to promote investment by public utilities. Congress sought to prevent rate-making commissions from requiring utilities to "flow through" the entire benefit to consumers then reducing their rates immediately for one time and thereby defeating the broad purpose of the credit. The lawmakers clearly intended that the benefits of the credit be shared by the utility and the ratepayers. This tax credit provides capital to the utility which must be accounted for on the company's balance sheet. Such tax credit capital should be allocated to debt and equity in the same proportions as the overall capital structure of the utility. *See Public Service Co. v. Federal Energy Regulatory Com'n,* 653 F.2d 681 (D.C.Cir.1981). The relevant Federal regulation requires the commission to allow the utility a rate of return that is not less than the taxpayer's overall cost of capital determined without regard to the credit. *See* Treasury Reg., § 1.46–6(B)(3)(ii) (1980).

The question here is whether the PSC can also require the utility to calculate a hypothetical interest expense for the portion of the credit allocated to debt in the capital structure and then use this hypothetical interest expense as a deduction in determining the utility's Federal income tax liability. Under the PSC theory, the utility's tax expense, as calculated for rate-making purposes, would be less because of the imputed interest deduction. The company's revenue requirements would be correspondingly lower as would the rates of the utility to its consumers.

Failure to comply with the federally-mandated rate-making treatment results in a loss of the credit. There is no report of any utility having ever lost the credit because its state regulatory commission imputed interest on that portion of the credit treated as debt since the credit was established in 1971. Every Federal court dealing with this issue has sustained the rate-making treatment followed by the PSC. *Union Electric Co. v. FERC,* 668 F.2d 389 (8th Cir.1981); *NEPCO Municipal Rate Committee v. FERC,* 668 F.2d 1327 (D.C. Cir.1981).

█ Continental's reliance on alleged violation of the uniform system of accounts pursuant to KRS 278.220 is without merit. That system determines how a regulated utility must keep its records. The issue before this Court is rate making and not record keeping.

Imputed interest is not allowed on the Federal income tax return because it did not occur. The commission's interest synchronization adjustment complies with Federal tax laws as interpreted by Federal courts. We believe the commission's rationale is that in the absence of the credit, the company would obtain the necessary capital with the same proportions of debt and equity as currently exist. *See E. Brigham, Financial Management Theory and Practice,* 512 (2d ed. 1979).

█ The real question is whether the commission can require the hypothetical interest expense to reduce the company's tax expense and lower its revenue requirements. We believe that such a determination does not exceed the authority of the commission.

An excellent analysis of the question has been made by the Supreme Judicial Court of Maine in *New England Tel. & Tel. Co. v. Public Utilities Com'n,* Me., 448 A.2d 272 (1982). We are persuaded that this rationale is correct and comports with the interpretation of the Federal law involved rendered by the highest Federal courts which

have considered the matter. *Union Electric Co., supra; NEPCO Municipal Rate Committee, supra.* The refusal of the intermediate appellate court in *North Carolina Utilities Com'n v. Carolina Telephone & Telegraph Co.,* 61 N.C.App. 42, 300 S.E.2d 395 (1983), to follow this rationale is unsound when considered in regard to the legislative history of the tax credit.

In *Public Service Company of New Mexico v. FERC, supra,* a Federal Court of Appeals upheld the Federal Energy Regulatory Commission policy of spreading the tax credit capital throughout the capital structure in the same proportion as the existing capital. This is the same as the commission has done in this case. The Supreme Court of Rhode Island adopted the same reasoning in *Narragansett Electric Co. v. Burke,* R.I., 475 A.2d 1379 (1984). The Supreme Court of Alabama has rejected a similar argument made by General Telephone Company in *General Telephone of Southeast v. Alabama Public Service Commission,* Ala., 424 So.2d 1288 (1983).

■ The company is wrong in its contention that the cost of debt should be the determinative factor in establishing a rate of return on equity. The commission follows the landmark principle of rate making set out in *Bluefield Water Works & Improvement Co. v. Public Service Com'n,* 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 (1923). The company has failed to demonstrate by clear and satisfactory evidence that the commission's interest synchronization adjustment is unlawful or unreasonable pursuant to KRS 278.430.

■ There is no evidence that the IRS has taken action to void the tax credit of those utilities where the regulatory commissions and the courts have required hypothetical interest. Federal tax law does not require the commission to award the company a return above its cost of capital on the unamortized balance of the job development investment tax credit. Consequently, it was not arbitrary for the PSC to require the hypothetical interest expense.

Under 26 I.R.C. § 46(c)(3), a tax credit against income is available to regulated companies qualifying as a public utility. The credit is computed on a percentage of qualifying investment. Under the option selected by the company, the unused or deferred amounts of the tax credit must be included in the rate base for rate-making purposes or the tax credit will be lost. 26 IRC § 46(f). The code and IRS regulations require that the portion of the credit included in the capital structure be assigned a rate not lower than the taxpayer or utility overall cost of capital. What constitutes the fair overall cost of capital rate depends in part on the practices of the individual regulatory commission. Treas.Reg. § 1.46–6(b)(3)(ii) (1980).

■ In Kentucky a utility company's required net operating income for rate-making purposes is computed by applying its cost of capital to its capital structure. Rate of return on a rate base is an after the fact unnecessary exercise in arithmetic. If you begin with an abstract rate of return on a rate base, it might produce enough to over-service the capital, or it might not be sufficient. A utility is only permitted to earn a return on debt, equity and preferred, which are sources of capital supplied by investors. *See Federal Power Com'n v. Hope Natural Gas Co.,* 320 U.S. 591, 603, 64 S.Ct. 281, 88 L.Ed. 333 (1944). The inclusion of the tax credit in a utility capital structure is a statutory exception to this rule because the tax credit is a cost-free source of capital not supplied by investors. It is entitled to a return only because of the provisions of the IRS code.

## II RATE OF RETURN

■ The circuit court's reversal of the commission's decision on rate of return was erroneous. The commission's determination as to the appropriate rate of return is supported by substantial evidence and is lawful. The Commission set forth in its order a variety of reasons which support its rate of return findings. The record is clear that the commission carefully considered the testimony and evidence of

record in regard to the discounted cash flow method (DCF), a Comparable Earnings Method, and a debt-equity spread method. The DCF method generates a cost of equity by equating a given market price of stock with the anticipated future cash flow from dividends and market price appreciation through growth. It is a widely accepted method in economic rate calculations. The commission also examined the capital structure of Continental and its parent corporation and the history of earnings of the parent corporation. Specific findings were made in regard to yield on equity and growth rates. There is substantial evidence of probative value regarding the appropriate required return. *See Citizens Telephone Co. v. Public Service Com'n, supra.* The Commission determined that the growth component of the company's DCF analysis was overstated and rejected the debt-equity spread method as inappropriate. Such a finding is clearly within the purview of the commission. *Energy Regulatory Com'n v. Kentucky Power Co.,* Ky. App., 605 S.W.2d 46 (1980); *Citizens Telephone, supra.*

 The circuit court in reversing the commission established a rate of return of 15 percent on equity on the basis that it was a reasonable rate necessary to attract capital for continued service and necessary expansion. It held that the higher rate was within the commission's zone of reasonableness. The circuit court ignored one of the important objectives considered by the commission, that is, providing the lowest possible cost to the ratepayers. We believe the commission properly balanced all of the objectives to be considered and determined that a rate of return of 14.25 was the best to meet the requirements of the law. The commission found that a rate of return in the range of 13.5 to 15 percent would be appropriate and used the midpoint, 14.25, for rate making. These computations come within the zone of reasonableness as established by the evidence in the record. This factual determination by the commission was not confiscatory and should not be disturbed on appeal. *Com-*

*monwealth, ex rel., Stephens v. South Central Bell,* Ky., 545 S.W.2d 927 (1976).

 The company makes an interesting but unconvincing theoretical argument that because AAA-rated bonds were available at 15 percent, a rate of return of 14.25 percent on equity is unreasonable. No court has adopted such reasoning. *Stephens v. South Central Bell, supra,* affirmed a rate of return slightly less than the current interest rate on high-grade corporate bonds. The authorities cited by the company are unpersuasive.

## III INTRASTATE TOLL REVENUE

This question relates to the amount of intrastate toll revenue the commission assigned to the company from long-distance calls that involve the equipment of other telephone utilities.

 In both Court of Appeals decisions, the panels erroneously invaded the fact-finding province of the commission when they weighed conflicting evidence on intrastate toll revenues.

 The commission properly attempted to match expected revenues and expenses pursuant to accounting adjustments to a historical test year. The basis of the subject adjustments is a change that occurred in the year following the test year which can be measured with reasonable certainty. It is not disputed that a toll adjustment to the test year revenues was necessary. The only question is how and in what amount.

Generally accepted rate-making principles permit matters within the test year to be both normalized and annualized. There is also a provision for an adjustment because of known and measurable changes outside the test year. In Case No. 8150, decided August 11, 1981, the commission granted South Central Bell an opportunity to achieve the rate of 11.34 as a rate of return on Kentucky intrastate operations. The commission used the same rate of return of 11.34 percent in determining the increase in intrastate toll service revenues in this case and increased Continental's ad-

justed intrastate toll service revenue by $584,494.

■ Continental and South Central use the cost method for determining Continental's share of toll revenues generated by the intrastate network. Under this formula, Continental receives from South Central its actual intrastate toll operating expenses plus a return on its toll rate base equal to the return achieved by South Central Bell on intrastate rate base. The decision of the commission was well within reasonable rate-making formulas.

Continental had a full opportunity to present its position on these issues at the hearings held on May 4 and August 4, 1981. The utility raised no issues that were not fully considered by the commission prior to its order of September 21, 1981, in Rate Case No. 8182. The commission denied a rehearing to the company on the same issues on October 26, 1981.

The company's estimate was based on South Central's 1980 return of 7.76. Obviously the commission was not convinced that this estimate was appropriate. Such a decision is clearly within the prerogative of the commission. *Dawson v. Driver,* Ky., 420 S.W.2d 553 (1967); *Energy Regulatory Com'n v. Kentucky Power,* Ky.App., 605 S.W.2d 46 (1980).

Taking notice of Bell's return in making calculations on intrastate toll revenues for independent telephone companies has been recognized in *State v. Alabama Public Service Com'n.,* 293 Ala. 553, 307 So.2d 521, 535 (1975). Historical data need not be used. The commission's choice of the opportunity rate of Bell was proper.

Both the circuit court and the Court of Appeals have applied an erroneous standard of review to the finding of fact by the commission. A reviewing court cannot weigh the evidence. *Energy Regulatory Com'n, supra; Kentucky State Racing Com'n v. Fuller,* Ky., 481 S.W.2d 298 (1972); *Thurman v. Meridian Mutual Ins. Co.,* Ky., 345 S.W.2d 635 (1961).

The treatment of intrastate toll revenue given by the commission does not produce

per se confiscation. *Stephens v. South Central Bell,* Ky., 545 S.W.2d 927 (1976). The commission is a regulator and not a guarantor. *Commonwealth v. Brown,* Ky., 605 S.W.2d 497 (1980).

*Kentucky Power Co. v. Energy Regulatory Com'n,* Ky., 623 S.W.2d 904 (1981) is not applicable here because the facts in that case were undisputed. In this case obviously there is sharp conflict between the company and the commission's projections. Here the company did not present any updated evidence prior to the final order or the rehearing decision by the commission.

In Case No. 8428, the commission accepted a number of expense adjustments to the historic test period. The company offered no updated information as to the return on toll facilities. A public hearing to consider the matter was held on May 6, 1982, and briefs were filed with the commission by May 26, 1982. The commission's order in the South Central Bell case relating to intrastate toll revenues had been issued on August 11, 1981. Clearly the company had ample opportunity to digest the impact of the South Central Bell adjustment and did not present any new or convincing evidence to the commission. In 1980, the earned return annualized was 7.76 percent and in this case the company requested the use of 9.1 percent. The commission utilized the annualized actual average intrastate rate of return for the first three months of 1982 at 11.09 percent. In this case, the historic test year ended September 1981.

■ The decision of the commission was supported by substantial evidence of probative value and should not have been disturbed on appeal either by the circuit court or the Court of Appeals. The company's complaint is that the commission speculatively attributed toll revenues to the company by concluding, contrary to the historic evidence, that South Central Bell would earn a rate of return of 11.09 percent during the next 12 months instead of the return of 9.1 percent which was Continental's projection. Even the company's

figures exceed the historical 7.76 percent for the year 1980.

The commission has properly adjusted for known and measurable changes. The decisions of the Court of Appeals in regard to toll revenues are reversed.

The decision of the Court of Appeals in Case No. 84–SC–613–DG and 84–SC–607–DG is affirmed in regard to job development investment tax credit and rate of return and reversed in regard to toll revenues.

The decision of the Court of Appeals in Case No. 84–SC–360–DG and 84–SC–368–DG is reversed.

The decision of the circuit court in Case No. 84–SC–957–TRG and 84–SC–958–TRG is reversed and remanded for a judgment in conformity with this opinion and the order of the Public Service Commission is reinstated.

STEPHENS, C.J., and LEIBSON, VANCE and STEPHENSON, JJ., concur.

AKER and GANT, JJ., dissent.